# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 418 | **DATE** | November 4, 2003 |
| **CASE TITLE** | *United States of America v. Kapp* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☐ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court DENIES Defendant Kapp's Motion for a Judgment of Acquittal, or in the Alternative for a New Trial, pursuant to Federal Rules of Criminal Procedure 29 and 33 [120-1 and 2]. It is so ordered.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | number of notices | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | NOV 06 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | U.S. DISTRICT COURT | | 147 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 03 NOV -5 AM 9:06 | date mailed notice | |
| RTS | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES of AMERICA )
)
v. ) Hon. Blanche M. Manning
)
) 02 CR 418-1
WILLIAM R. KAPP )

## MEMORANDUM AND ORDER

After an eight-day trial, a jury found Defendant William R. Kapp guilty of violating and

conspiring to violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. and the

Lacey Act, 16 U.S.C. § 3272 et seq. The present matter comes before the Court on Kapp's

Motion for a Judgment of Acquittal, or in the Alternative for a New Trial, pursuant to Federal

Rules of Criminal Procedure 29 and 33. For the reasons set forth below, this Court DENIES

Kapp's motion.

## BACKGROUND[1]

The Government's 28-Count Indictment alleged that Kapp was involved in the unlawful

trafficking of the meat and hides of endangered animals. Kapp purchased endangered wildlife,

including tigers (*Panthera tigris*) and leopards (*Panthera pardus*), from exotic animal exhibitors

and dealers, shot, killed, skinned and transported the animals, caused others to shoot, kill, skin,

and transport the animals, and transported and sold the hides and meat of the animals for profit.

In August of 1997, Kapp met with others at the Funky Monkey Animal Park in Crete,

Illinois, and participated in the killing of three caged, endangered animals, including one leopard

and two Bengal Tigers. Kapp then participated in the pre-arranged sale, processing, and

---

[1] The facts in the Background section are taken from the Indictment, evidence and
testimony presented at trial, and the parties' submissions.

mounting of the animal carcasses, which included transporting and skinning the carcasses, processing the carcasses for use as meat, shipping the hides to New York for tanning, shipping the fully mounted hide and skull of the leopard, and falsifying United States Department of Agriculture Form 7020 to make it appear that the animals had been "donated" rather than sold to end users. The indictment further charged that Kapp participated in the March, 1998 killing of eight endangered tigers in Alsip, Illinois, as well as their subsequent processing and sale.

Before trial Kapp moved to dismiss the indictment on the grounds that: (1) the indictment failed to allege sufficient facts to constitute a violation of federal law; and (2) the relevant provisions of the ESA are unconstitutionally vague. In denying the motion, this Court found that: (1) the Government's failure to specifically allege that the animals at issue were captive wildlife and not unprotected hybrids was not fatally insufficient; and (2) the ESA and its regulations were not void for vagueness because they are detailed enough to put a reasonable person on notice as to what conduct is prohibited.

Before the start of trial, the Court granted the Government's motions in limine to: (1) preclude Kapp from presenting evidence or argument intended to elicit jury nullification; (2) admit evidence of the remains of other endangered animals found in Kapp's home; (3) preclude reference to the 1999 suicide of a local taxidermist; (4) preclude reference to Kapp's disability; (5) preclude evidence of drug use and prior arrests of Government witnesses without notice to the Government; and (6) preclude Kapp from defining reasonable doubt to the jury.

Likewise, Kapp moved under Rule 403 of the Federal Rules of Evidence to preclude the admission of the mounted tigers and leopards seized from Kapp's home. Kapp contended that the unfair prejudice from the presentation of the mounts to the jury would substantially outweigh

2

their probative value. This Court denied the motion, ruling that the mounts had sufficient probative value, and presented little risk of unfair prejudice to Kapp.

At trial, the Government presented evidence that included recorded conversations in which Kapp discussed plans to transport, kill, and sell endangered tigers and leopards, the testimony of USFWS agents and other witnesses as to their conversations with Kapp regarding his plans to traffic in endangered tigers and leopards, a videotape showing Kapp shooting a tiger, mounts of tigers and leopards purchased, killed, processed, transported and sold by Kapp, expert testimony as to the identity of the animal mounts, and documentary evidence of Kapp's processing and sale of endangered tigers and leopards and Kapp's falsification of USDA forms.

At the close of evidence but before the verdict was rendered, Kapp moved for a Judgment of Acquittal, which was denied. The jury subsequently found Kapp guilty as to seventeen counts (nos. 1, 2, 3, 7, 8, 11, 13, 14, 16, 17, 18, 20, 21, 22, 23, 24 and 26), and not guilty as to two counts (nos. 5 and 25). Kapp now comes before this Court for a judgment of acquittal, or in the alternative for a new trial, pursuant to Rules 29 and 33.

## STANDARD OF REVIEW

Under Rule 29, a court may acquit a defendant of "one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." When reviewing a motion for judgment of acquittal pursuant to Rule 29, the Seventh Circuit mandates that the district court determine:

> whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government . . . bearing in mind that it is the exclusive function of the jury to determine the credibility of

> witnesses, resolve evidentiary conflicts, and draw reasonable
> inferences.

United States v. Reed, 875 F.2d 107, 111 (7th Cir. 1989). In short, the court views all the

evidence in the government's favor and is absolutely barred from second-guessing the jury's

credibility determinations or findings of fact. Id. Instead, the court merely assesses the record to

determine if all the admissible evidence supports the defendant's adjudication of guilt beyond a

reasonable doubt. Id.

Rule 33 permits the Court to order a new trial "in the interests of justice." Unlike a

motion for acquittal under Rule 29, in ruling on a motion for a new trial under Rule 33, the court

is not required to view the evidence in a light most favorable to the government. United States v.

Washington, 184 F.3d 653, 657 (7th Cir. 1999); 58 Am.Jur.2d New Trial § 391 (2001). Despite

the more lenient standard, however, Rule 33 motions are nevertheless disfavored and courts

generally should only grant in "the most extreme cases." United States v. Linwood, 142 F.3d

418, 422 (7th Cir. 1998). See also United States v. Kamel, 965 F.2d 484, 490 n. 7 (7th Cir.

1992). The trial court "may not re-weigh the evidence and set aside the verdict simply because it

feels some other result would be more reasonable." Reed, 875 F.2d at 113. The court may only

order a new trial if "the verdict is against the manifest weight of the evidence" and a guilty

verdict would result in a "miscarriage of justice." Washington, 184 F.3d at 657.

**ANALYSIS**

Kapp contends the he is entitled to a judgment of acquittal or a new trial based on:

(I) the admission of mounted tigers and leopards into evidence; (II) the denial of Kapp's request

to present a reliance on public authority defense; (III) the giving of an improper jury instruction

on the knowledge requirement under the ESA; and (IV) the Court's refusal to permit Kapp to

argue to the jury that crosses of multiple subspecies of tigers are not protected under the ESA and

the denial of his motion for acquittal after the close of evidence on the same theory. The Court

will address each of these contentions in turn.

**I.     The Admission of Mounted Tiger and Leopards**

Kapp contends that the Court erred in not granting his motion in limine to preclude the

Government from presenting to the jury the mounted skulls and hides of tigers and leopards that

were seized from Kapp. Kapp contends that the presentation of the animal mounts to the jury

was unduly prejudicial and improperly aroused the emotions of the jury by focusing on the

"heinousness of [Kapp's] conduct, i.e. his bad character," while providing little in the way of

probative evidence that Kapp violated federal law. According to Kapp, this evidence was not

relevant because the matter in dispute was not whether he killed the leopards and the tigers and

had them mounted, but rather whether the animals were endangered.

In denying Kapp's motion in limine, this Court held that under Federal Rule of Evidence

403, "the admission of the mounted animals is not substantially outweighed by the danger of

unfair prejudice." (March 20, 2003, Memorandum and Order, at 3.) Under Rule 403, relevant

evidence should only be excluded where its probative value is "substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury." Mere prejudice to

5

the defendant is not reason enough to exclude evidence. United States v. Curry, 79 F.3d 1489,

1496 (7th Cir. 1996). Because most relevant evidence is prejudicial, to be excluded, the

evidence must be unfairly prejudicial. Id. The Comments to Rule 403 state that "unfair

prejudice means an undue tendency to suggest decision on an improper basis, commonly, though

not necessarily, an emotional one." Thus, courts apply Rule 403 in a manner that favors the

admission of relevant evidence, and only exclude evidence when unfair prejudice threatens to

overwhelm its probative value. The greater the probative value of the evidence, the more willing

the court will be to tolerate some risk of prejudice. United States v. Torres, 977 F.2d 321, 328

(7th Cir. 1992). The question of admissibility of evidence under Rule 403 is essentially the

province of the trial court, which is in the best position to make evidentiary determinations. Id.

at 329.

Courts have permitted prejudicial evidence in a variety of circumstances where the

evidence was necessary for the jury to assess some element of the prosecution or the defense.

See United States v. Lightfoot, 224 F.3d 586, 588 (2000). For example, courts have admitted

evidence of prior unlawful conduct to illustrate a defendant's modus operandi, Curry, 79 F.3d at

1496, evidence of a defendant's spending habits to show an incriminating pattern of behavior in a

prosecution for bank robbery, United States v. Blackburn, 992 F.2d 666, 669 (7th Cir. 1993),

and, notably, potentially shocking or upsetting documentary evidence to illustrate the testimony

of a Government witness. United States v. Salameh, 152 F.3d 88, 122-23 (2d Cir.

1998)(permitting admission of graphic photographs of victims of the first World Trade Center

bombing to support expert testimony about nature of explosion); United States v. Davidson, 122

F.3d 531, 538 (8th Cir. 1997) (permitting the use of "graphic" autopsy photographs in

6

conjunction with a doctor's testimony).

Here, the Court finds that the animal mounts were very relevant to the case against Kapp. The Government presented the animal mounts to demonstrate: (1) Kapp's purpose in killing the animals (to manufacture and sell the mounts to customers); and (2) to rebut Kapp's claim that the animals were hybrids and thus not protected as endangered species under the ESA. The mounts allowed the jury to see that the animals had been killed, how they were processed after killing, and Kapp's motive in participating in their killing and processing. Furthermore, the mounts allowed the Government to demonstrate, and the jury to observe from the best available physical evidence, that the animals in question were, indeed, endangered leopards and tigers protected by the ESA.

Assuming that there was some prejudice to Kapp from the display of the mounts, the prejudice did not "substantially outweigh[]" the probative value, as required by Rule 403. While the mounts were unusual courtroom exhibits, it was not because of their shock value, but rather because they gave jurors a rare look into the world of taxidermy. The mounts were no more shocking or disturbing than the mounted animals displayed at any museum of natural history, including the Field Museum of Natural History in Chicago. Therefore, even if the mounts were slightly disturbing to some jurors, whatever upset they caused did not result in unfair prejudice to Kapp.

Thus, because the animal mounts were probative of Kapp's culpability as to the charged offenses, and the risk of undue prejudice was not great, the admission of the mounts was proper under Rule 403, and Kapp was not entitled to exclusion of the evidence.

## II.    Reliance on Public Authority Defense

Kapp further contends that the Court erred in: (1) not entering a judgment of acquittal prior to the verdict based on Kapp's defense of reliance on public authority; (2) not giving Seventh Circuit Pattern Instruction No. 6.07 (reliance on public authority); and (3) ruling that there was insufficient evidence for Kapp to present the public authority defense to the jury. In reviewing these contentions, the Court will examine whether Kapp presented sufficient evidence of reliance on public authority and was therefore entitled to present the defense.

The standard for determining whether Kapp presented sufficient evidence to warrant submission of a jury instruction as to a defense is analogous to the standard for determining whether he presented enough evidence to raise the defense at trial. United States v. Santiago-Godinez, 12 F.3d 722, 726 (7th Cir. 1993). A defendant is entitled to assert a defense if: (1) the defendant proposes a correct statement of the law; (2) the defendant's theory is supported by the evidence; (3) the defendant's theory is not part of the government's charge; and (4) the failure to include an instruction as to the defendant's theory of defense would render the defendant's trial unfair. Id. at 728 n.4.

To present the defense of "reliance on public authority," or "entrapment by estoppel," the defendant must produce sufficient evidence upon which a rational jury could find the elements of the defense, namely that a public official affirmatively misled the defendant and that the defendant reasonably relied on the public official in engaging in the unlawful charged conduct. See Santiago-Godinez, 12 F.3d at 726; United States v. Howell, 37 F.3d 1197, 1204 (7th Cir. 1994). More particularly, the defendant must show that: (1) he was misled by an official of the state; (2) the official actively misled him; and (3) the reliance on the official's misleading

8

statement was "reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation," and (4) the reliance was in good faith. Howell, 37 F.3d at 1204. A party asserting this defense bears a heavy burden not only of proving the elements of the defense, but also of outweighing "the strong, countervailing interest in obedience to the law." United States v. McGaughey, 977 F.2d 1067, 1074 (7th Cir. 1992).

Here, Kapp contends that he reasonably relied on the Fact Sheet published in March, 1998 ("Fact Sheet") by the United States Fish and Wildlife Service ("USFWS") in determining that his conduct was lawful. According to Kapp, the Fact Sheet led him to believe that the animals he participated in killing, processing, and selling were not protected by the ESA because they were hybrids. After reviewing the trial testimony, however, this Court finds that Kapp presented insufficient evidence at trial to suggest that he either relied on the Fact Sheet or that any such reliance was reasonable.

The Fact Sheet in question was one in a series of periodic updates issued by the USFWS to alert the public about laws and regulations within the USFWS's purview, including those concerning the protection of endangered species. The Fact Sheet included a passage that, according to Kapp, set forth a definition of hybrids – a category of animals not protected by the ESA– that was broader than the definition given in other versions of the Fact Sheet, including those published both before and after March, 1998. The Fact Sheet stated:

> [H]ybrids [are] the offspring of animals or plants where each parent is from a different *species/subspecies* and where at least one parent is listed under the [ESA]. . . . Hybrid offspring of animals bred or propagated in captivity are not protected by the [ESA].

(Emphasis added.) Kapp contends that this broader definition led him to believe that the subject

animals were not protected by the ESA, because the animals were subspecies hybrids of tigers and leopards, and according to Kapp's interpretation of the Fact Sheet, subspecies hybrids are not protected.[2]

Kapp contends that his reliance on the Fact Sheet can be inferred from the fact that a copy of the Fact Sheet was recovered from his home during a search by USFWS agents. This alone, however, is insufficient evidence that Kapp actually relied on the Fact Sheet because Kapp engaged in much of the charged conduct, including the conduct charged in at least ten counts of the Indictment, prior to the publication of the Fact Sheet. Kapp obviously could not have relied on a publication that was not even in existence at the time he committed his unlawful acts. The defense of reliance on public authority is inapplicable if the defendant has not acted on the basis of having been misled. United States v. Tallmadge, 829 F.2d 767, 775 n.1. (9th Cir. 1987).

Furthermore, as to the conduct committed during and after March, 1998, after the Fact Sheet had been published, while it is unclear when Kapp received the Fact Sheet, Kapp presented no testimony or other evidence at trial that he had, in fact, read or relied upon the Fact Sheet before engaging in the balance of the charged conduct.[3] Kapp cites to transcripts of his conversations with USFWS agents as evidence of his reliance on the USFWS's allegedly broader

_____

[2] As discussed below, this purported interpretation of the Fact Sheet is not the law. Under the ESA and its regulations, all sub- (or intra-) species hybrids of an animal are protected where the animal is protected at the species level, as with tigers and leopards. What are generally not protected by the ESA are inter-species hybrids and sub-(or intra-)species hybrids of an animal that is protected solely at the sub-species level. The animals in question here were protected at the species level and were not inter-species hybrids, and hence were protected whether or not they were sub-species hybrids.

[3] In fact, as the Government contends, "Kapp, through counsel, disclaimed any argument that Kapp actually saw and relied upon" the Fact Sheet.

definition of hybrids. However, neither the excerpts cited by Kapp nor any other portion of the recorded conversations suggest that Kapp relied on any definition of hybrids other than that adduced at trial as the official USFWS definition of unprotected hybrids, as set forth in the Code of Federal Regulations and as consistently articulated as the policy of USFWS.

Indeed, far from proving that Kapp relied on an incorrect understanding of hybrids under the ESA and USFWS policy, the taped conversations offered by Kapp show that he correctly understood that, as a general rule, only *inter*-species hybrids were excluded from ESA protection, not *intra*-species hybrids.[4] For example, Kapp quotes himself as saying, "As long as . . . it's a non - - it can't reproduce anything to the species . . . then you can legally put it down." This suggests that Kapp understood the distinction between the two types of hybrids and the significance of the distinction. Kapp's use of the word "species" implies his correct understanding that inter-species hybrids, which cannot "reproduce anything to the species," are not protected under the ESA, while intra-species hybrids, which clearly do continue to reproduce into the species, are protected. Kapp's own words undermine his attempts to claim that intra-species hybrids are not protected under the ESA.

Additionally, Kapp contends to have received assurances from personal acquaintances with the USFWS that his conduct was legal. For example, Kapp was recorded stating that: "there was a girl I used to date that was with Fish and Wildlife and then I knew a bunch of the investigators — And that's talking with them, they said as far as we're concerned, we want this stuff dead. We don't think anybody should be allowed to have this stuff as pets." There are

---

[4] As discussed below, intra-species hybrids are excluded from protection only in the rare case in which they are listed by the ESA solely at the sub-species level.

several problems with this contention. First, Kapp presents no evidence that such conversations actually took place other than transcripts recounting his own self-serving statements to Government agents. Two, as with the Fact Sheet, the alleged assurances by USFWS officials were given in Spring of 1998, well after Kapp had committed many of the acts charged in the indictment. Third, however plausible, these alleged assurances do not constitute a defense to Kapp's criminal conduct because even if Kapp received such assurances, it was unreasonable for him to rely on them.

A defendant's reliance on information is reasonable only if "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." Brebner, 951 F.2d at 1025. Reliance on assurances by public officials is reasonable only if there is substantial evidence that advice was given by officials or government agencies of sufficient knowledge and authority to offer such advice. See, e.g., Tallmadge, 829 F.2d at 775 (finding defendant's reliance on gun dealer's assurances that weapon ownership was legal was reasonable when it was congruous with the advice of defendant's attorney's and comments by prosecutor and judge at defendant's probation hearing); United States v. Hedges, 912 F.2d 1397, 1405 (11th Cir. 1990) (permitting defense of reliance of public authority where defendant presented abundant evidence that he had received advice from an Air Force Standards of Conduct Officer).

Here, Kapp claims to have relied solely on personal and informal conversations with USFWS officials before engaging in the act of killing and trafficking in animals that he at least suspected were protected by the ESA. If Kapp had been truly desirous of obeying the law, i.e. not killing and trading in animals protected by law, it is unlikely he would have been satisfied

with informal assurances from "[t]he guy in Washington and the girl I used to date," (Gov. Ex. Tr. 2 at 2) but rather would have sought further, official clarification of the ESA and USFWS policy before proceeding.

Furthermore, regardless of the alleged assurances, any reliance was not in good faith. In the very transcript Kapp proffers as evidence of his reliance on authority, he is quoted as telling a Government agent,

> Kapp:  I mean you can legally mount 'em . . . as long as you have the proper paperwork. . . . That's what Fish & Wildlife really pushes is that the animals have to be donated, nothing can change, exchange hands.
>
> (Agent) Roche: Do they believe that though?
>
> Kapp: No, look at us here . . . but they don't care.

Kapp exhibits no good faith interest in obeying the law. Rather, his conduct shows that he was interested in establishing a defensible posture should his conduct ever come under scrutiny. Kapp discusses the need for the "proper paperwork" showing that the animals were not imported into the United States and that Kapp was "donating" the animals rather than selling them to customers, thus making his trafficking activities appear lawful. If anything, this demonstrates Kapp's awareness that his conduct was at best of questionable legality, and provides evidence of his intent to use a few well-placed documents to camouflage his illegal activities. Further, the conversations demonstrate Kapp's motivation for repeatedly falsifying USDA Form 7020 as one way of hiding his tracks. Indeed, in one recorded conversation, Kapp acknowledges that "[i]t's illegal to actually sell the animal," and describes to an undercover Government agent "all sorts of [other] little tricks" he used to give his unlawful transactions the appearance of propriety.

As further evidence of Kapp's awareness of the unlawfulness of his conduct, the Government presented uncontradicted evidence that several of Kapp's prospective customers decided not to make purchases from Kapp after being advised by USFWS that such transactions were illegal, and Kapp knew that his prospective customers had been so advised. The Government also offers several excerpts of conversations occurring in 1999 in which Kapp affirmatively indicated his understanding that it was illegal to sell and to offer to sell tiger and leopard mounts under the ESA, repeatedly using the terms "protected" and "endangered" in reference to tigers and leopards. Thus, Kapp's claim to have relied mistakenly, reasonably, and in good faith on official assurances as to the legality of his conduct is unavailing.

Accordingly, because Kapp failed to show he was actually misled or that he reasonably and in good faith relied on government information, under the standards set forth by the Seventh Circuit, Kapp was not entitled to argue to the jury, or to present a jury instruction on, the defense of reliance on public authority.

## III.    The Knowledge Requirement Under the ESA

Kapp also contends that this Court erred in instructing the jury as to the requisite mental state needed to constitute a violation under the ESA. The instruction in question stated in pertinent part that "it is sufficient that the government prove that the defendant knew that he was taking, selling, offering for sale, delivering, receiving, carrying, or transporting, or causing to be delivered, received, carried, or transported, a tiger or leopard." The instruction further stated that the jurors "may, but are not required to, infer that the defendant acted knowingly if you find that the defendant knew that the animal he took looked like a tiger or leopard." Kapp contends that this instruction misstated the law because it permitted the jury to find Kapp guilty upon

14

finding a lesser degree of *mens rea* than required under the ESA.

Courts have held that violations of the ESA are crimes of general intent. United States v. McKittrick, 142 F.3d 1170, 1177 (9th Cir. 1998); United States v. Nguyen, 916 F.2d 1016, 1018 (5th Cir. 1990). General intent offenses are those offenses for which the requisite mental state is merely that the defendant was aware of his conduct when he committed the acts giving rise to the offense. See United States v. Bates, 96 F.3d 964, 967-68 (7th Cir. 1996). Unlike specific intent offenses, general intent crimes do not require proof that a defendant had a criminal objective when he engaged in the charged conduct. Id. For example, robbery is a general intent crime because it has no explicit intent requirement; the criminal culpability is implicit in the commission of theft by force or threat of force. People v. Lewis, 651 N.E.2d 72, 87 (Ill. 1995). By contrast, burglary is specific intent offense because intent to commit a felony is an element of the crime. People v. Camp, 559 N.E.2d 26, 29 (Ill. App. Ct. 1990).

Because the ESA does not require proof that the defendant had a criminal objective or was even aware of the unlawfulness of his conduct, courts have held that the ESA is a general intent statute. McKittrick, 142 F.3d at 1177; Nguyen, 916 F.2d at 1018.[5] The statute merely requires that the Government show that the defendant knowingly violated a provision of the Act. 16 U.S.C. 1540 (b).

The Fifth and the Ninth Circuits have both considered the question of what constitutes a "knowing" violation of the ESA. The Ninth Circuit set a low threshold for proving knowledge in McKittrick, 142 F.3d at 1177, where it held that the defendant had violated the ESA when he

---

[5] "The plain intent of Congress. . . was to halt . . . species extinction, whatever the cost. . . . Congress intended to make violations of [the ESA's] provisions a general intent crime." Nguyen, 916 F.2d at 1018.

shot a protected animal without knowing it was protected; the knowledge requirement was satisfied because the defendant "knew he was shooting an animal, and that animal turned out to be a protected gray wolf." The Fifth Circuit established a more stringent requirement, holding that a jury must find that the defendant not only knew that the subject animal was an animal, but also that it was an animal of particular type (e.g., a turtle). Nguyen, 916 F.2d at 1018. While the two courts differed slightly in their interpretation of the mental state requirement under the ESA, neither standard requires that the defendant knew that the subject animal was protected under the ESA.

Here, in giving the above instruction, this Court imposed upon the Government the more onerous requirement set out in Nguyen by requiring that the Government prove that Kapp knew the subject animal was a tiger or a leopard.

Kapp further contends that the instruction was flawed because it directed the jury to presume that, if Kapp knew the subject animals looked like a tiger or a leopard, then "Kapp could 'know' they were illegal." The instruction submitted by this Court does no such thing. The instruction permitted the jury, if it chose, to make the logical inference that, if Kapp recognized an animal as looking like a tiger or a leopard, he knew the animal was a tiger or a leopard. Inviting, but not requiring, a jury to make an inference is permissible, so long as there is some rational way the jury can make the connection suggested by the inference. See County Court of Ulster County, N.Y. v. Allen, 442 U.S. 140, 157 (1979). It is certainly rational to infer that if Kapp knew that the animals appeared to be tigers and leopards, he knew they were tigers and leopards.

Consequently, this Court finds that it did not err in giving the above instruction and that

Kapp's right to a fair trial was not unduly prejudiced and that this is not an "exceptional case" where "the verdict is against the manifest weight of the evidence" and the guilty verdict would result in a "miscarriage of justice. <u>Washington</u>, 184 F.3d at 657.

## IV.    Kapp's Argument and Exhibit Concerning Hybrids

Kapp additionally contends that he is entitled to a judgment of acquittal and a new trial because this Court improperly precluded him from arguing and presenting evidence that the subject animals were hybrids and not protected under the ESA.

Kapp's contention that hybrids are, as a general rule, excluded from protection under the ESA is apparently based upon his interpretation of the Fact Sheet. The Fact Sheet defined a hybrid as "the offspring of animals . . . where each parent is from a different species/subspecies and where at least one parent is listed under the Act." The Fact Sheet further stated that "[h]ybrid offspring of animals bred or propagated in captivity are not protected by the [ESA]." Therefore, according to Kapp, hybrids of subspecies are not protected by the ESA, even where the species is protected. According to this understanding of the law, even if tigers were protected at the species level, hybrids of tiger subspecies would *not* be protected.

Pursuant to the ESA, the USFWS has promulgated and maintained a list of endangered and threatened wildlife. 50 C.F.R. § 10.1 (2003); 50 C.F.R. § 17.11 (2003). Tigers and leopards have been included on the USFWS's list of endangered and protected wildlife since 1970. 50 C.F.R. § 17.11(h). The tiger (*Panthera tigris*) is listed as endangered everywhere in the world; the leopard (*Panthera pardus*) is listed as endangered everywhere in the world except for some parts of Africa, where it is listed as threatened. <u>Id.</u> Thus, if the subject animals were tigers and leopards, they were endangered species under 50 C.F.R. § 17.11(h), and hence protected by the

ESA .

Kapp thus misapprehends the scope of protection afforded by the ESA and its application to the present facts. In its explanatory preface to the list of endangered species, the Code of Federal Regulations makes clear that "[t]he listing of a particular taxon includes all lower taxonomic units . . . [including] all . . . populations of that taxon." 50 C.F.R. § 17.11(g). In metaphoric terms, if the taxonomic classification of the animal kingdom is a family tree, illustrating in descending visual order kingdom (the broadest taxon, or classification), phylum, order, class, family, genus, species, and where pertinent, subspecies (the most narrow taxon), this means that if one branch of the tree is listed as endangered, all of that branch's sub-branches, and those sub-branches' sub-branches, and so on, are included. Because tigers and leopards are both listed as endangered at the species level, all lower taxonomic units within those species groups, i.e., recognized sub-species and the entire populations of tigers and leopards, are likewise protected. 50 C.F.R. § 17.11(g). Thus, Kapp's contention that some of the subject animals may be inter-subspecific hybrids (e.g., a hybrid of two sub-species of tigers or a hybrid of two sub-species of leopards) is irrelevant because if the subject animals were subspecies of tigers or leopards, they were protected under the ESA.[6]

Therefore, even if Kapp's reading of the USFWS Fact Sheet was correct, it is not the

---

[6] Such a claim might be relevant if there were evidence that a subject animal was a hybrid of one taxon protected under the ESA and one not protected by the ESA. For example, if a subject animal were a hybrid of two sub-species of tiger, where one subspecies was protected and the other not, then Kapp would be correct in asserting that such a hybrid might not be subject to ESA protection. However, because all tigers (and leopards), including all sub-species, are protected under the ESA, this contention is unavailing.

law.[7]  The ESA as implemented through the Code of Federal Regulations clearly and

unambiguously protects all sub-taxonomic branches of protected taxa.  The Government

presented abundant testimony by USFWS agents and other evidence at trial confirming this

interpretation of the law.  Under the law, the only circumstance under which a hybrid of two

subspecies would not be protected would be if one or both of the subspecies were not protected.

Thus, as a matter of fact and law, Kapp was properly precluded from arguing his hybrid

theory to the jury, or presenting exhibits to the jury as evidence thereof.  It is within the

discretion of the trial court to determine the exhibits and evidence to be presented to the jury, and

to withhold from the jury those items that are confusing or irrelevant.  United States v. Gross,

451 F.2d 1355, 1359 (7th Cir. 1971).  Because Kapp's hybrid argument was insufficient as a

matter of law to present at trial, exhibits presenting this theory would have been confusing and

irrelevant.

Additionally, Kapp contends that the Government failed to produce sufficient evidence at

trial to prove Kapp's guilt beyond a reasonable doubt.  After reviewing the evidence in the light

most favorable to the Government, this Court finds that the Government presented sufficient

evidence for the jury to reasonably conclude that Kapp: (1) violated the ESA by knowingly and

without permission killing endangered tigers and leopards within the United States, transporting

endangered tigers in interstate commerce during the course of commercial activity, and selling

and offering to sell an endangered leopard in interstate commerce; (2) violated the Lacey act by

knowingly selling tigers and leopards and their parts having a value exceeding $350, knowing

---

[7]  Moreover, as explained above, to the extent that Kapp relied on the Fact Sheet, such
reliance was not reasonable under the circumstances.

that these animals and animal parts were taken, possessed, transported, or sold in violation of, and in a manner unlawful and knowingly making and causing to be made false records related to endangered tigers and leopards and their parts, knowing that the animals and animal parts had been, or were intended to be, transported in interstate commerce; and (3) conspired to violate the ESA and the Lacey Act.

There was abundant evidence of Kapp's guilt, including recordings of conversations in which Kapp discussed plans to transport, kill, and sell endangered tigers and leopards, the testimony of USFWS agents and other witnesses as to their conversations with Kapp regarding his plans to traffic in endangered tigers and leopards, a videotape showing Kapp shooting a tiger, mounts of tigers and leopards purchased, killed, processed, transported and sold by Kapp, and documentary evidence of Kapp's processing and sale of endangered tigers and leopards. Furthermore, the Government presented sufficient evidence to show that Kapp knowingly trafficked in endangered tigers and leopards protected under the ESA, including expert testimony as to the identity of the animal mounts, recorded conversations in which Kapp discussed the tigers and leopards and his awareness of the unlawfulness of trafficking in them, witnesses who testified to such conversations, and documentary evidence of Kapp's awareness that the subject animals were protected tigers and leopards and his attempt to camouflage his trafficking.

Consequently, in interpreting the evidence in the light most favorable to the Government, this Court finds that the jury could reasonably have found beyond a reasonable doubt that Kapp committed the charged acts and that Kapp's right to a fair trial was not unduly prejudiced and that this is not an "exceptional case" where "the verdict is against the manifest weight of the evidence." Washington, 184 F.3d at 657.

## CONCLUSION

For the reasons set forth above, this Court DENIES Defendant Kapp's Motion for a Judgment of Acquittal, or in the Alternative for a New Trial, pursuant to Federal Rules of Criminal Procedure 29 and 33 [120-1 and 2].    It is so ordered.

ENTER:

*Blanche M. Manning*

**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: _11-4-03_

21